UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JOEL M. LEVY, *et al.*,

                          Plaintiffs,                    13-CV-2861 (JPO) (SN)

                 -v-                              <u>OPINION AND ORDER</u>

YOUNG ADULT INSTITUTE, INC., *et al.*,

                          Defendants.

-----------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

       In 2011, Young Adult Institute, Inc. ("YAI") stopped paying retirement benefits to its former CEO Joel Levy and his wife Judith Lynn. They sued under the Employment Retirement Income Security Act ("ERISA"), demanding that YAI immediately resume payment and reimburse them for the missed payments. They also alleged that certain reductions to Levy's retirement benefits and Lynn's surviving spouse benefit were unlawful and sued YAI's former board chair Eliot Green for breach of fiduciary duty for his role in convincing them to sign a contract agreeing to the reductions.

       This case has already seen one partial summary judgment motion. The Court decided that YAI could not be excused from paying Levy's benefits because of its own retrospective determination that those benefits were excessive in violation of state and federal law. The parties now ask the Court to return to that question and to address whether certain directives of a state regulator made performance of the contract impossible. Green, in turn, asks for summary judgment on the question of his liability for breach of fiduciary duty.

1

The Court concludes that YAI has no excuse for failing to pay Levy's retirement benefits. As the Court has already held, YAI's belated regret about the reasonableness of Levy's compensation does not justify reneging on its contract. Neither do backroom negotiations with a state regulator that failed to conclude explicitly that paying Levy his retirement benefits would violate the law. Levy undoubtedly agreed to reductions in his SERP benefits, but questions of fact remain regarding the enforceability of those agreements after YAI's default.

The plaintiffs' claims against Green are time-barred and further barred by a release of liability clause or, in the alternative, not cognizable because the contract is unenforceable.

## I.     Background

The following facts are taken from the parties' Rule 56.1 statements and from the summary judgment record. They are undisputed except where noted.

### A.     The Original SERP

Levy worked at YAI for more than forty years. He joined as an executive director and soon became CEO. In 1985, YAI's Board of Trustees established a supplemental executive retirement plan ("SERP") for Levy and other YAI executives. The Original SERP entitled Levy to a retirement annuity of up to 99.9% of his highest annual salary, less certain offsets from payments made through other retirement programs. It also entitled Levy's spouse to collect the same pension benefit for her lifetime if she survives him. Section 10.2.1 of the Original SERP provided that Levy's benefits would be 100% "[n]onforfeitable" after nineteen years of service. Dkt. No. 264-5 at 33. Levy reached nineteen years of service in 1989.

The Original SERP gave YAI the right to amend the terms of its trust by resolution of the Board or a duly appointed committee. But it prohibited any amendment that reduced any vested benefits or gave YAI any interest in the SERP Trust's assets. *Id.* at 22. The SERP stipulated that

the "certified copy of the resolution" authorizing amendment "shall constitute the instrument of amendment." *Id.* at 22-23.

### B.      The Life Insurance Plan and Trust

In 2003, YAI established a Life Insurance Plan and Trust ("LIPT") for Levy and other senior management. The LIPT provides a death benefit to Levy's survivors and is deemed fully vested. Section 12 of the LIPT provides that "no amendment shall conflict with the terms of the Plan or make the Trust revocable" and that the plan "shall not terminate until the date on which Plan participants and beneficiaries are no longer entitled to benefits pursuant to the plan." Dkt. No. 272-1 at 13.

### C.      The 2005 and 2008 Amendments

In 2005, YAI's compensation committee recommended reductions to the SERP's annuity in order to "better align" YAI "with industry practice." Dkt. No. 264-5 at 47. The reductions reflected the recommendations of a private consulting firm that found YAI's compensation levels to be unusually high. The committee recommended reducing Levy's annuity benefit from approximately 100% of his highest total earnings to 89% of his 2005 salary and bonus. *Id.* The committee recommended similar reductions for YAI's other executives. On March 22, 2005, the YAI Board of Trustees adopted the recommendations by vote. Dkt. No. 264-5 at 50. Levy was present at the meeting but denied being present when the Board discussed his benefits. *See* Dkt. No. 460-4 at 5-6. The amendments purported to cap Levy's SERP annuity at $625,813, less offsets. Levy testified that the Board presented this reduction to him as "a *fait accompli*" and that he could not challenge it. *Id.* at 31.

In 2008, YAI sought to replace Levy as CEO with his brother Phil Levy. As a part of the transition, the Board negotiated new employment contracts with the Levys. The negotiations

lasted approximately five months, and Levy was represented at the Board's expense by Cadwalader, Wickersham & Taft. The negotiations yielded a September 2008 Employment Agreement, which set the terms for Levy's employment during the transition period and promised him work as a consultant after Phil Levy took over as CEO. The Employment Agreement entitled Levy to an annual base salary of $680,000 and an annual bonus of at least $120,000. It also governed Levy's other benefits, including his retirement benefits.

Under Section 4(e) of the Employment Agreement, Levy agreed to reduce the SERP annuity to $625,813. Dkt. No. 461-4 at 4. Section 4(e) also purported to amend the SERP to incorporate the benefit reduction and directed YAI to buy a commercial annuity by June 30, 2010, that would mimic the SERP's annuity payments. The YAI Board approved the agreement at a special meeting, and Board Chair Marci Fava and Levy signed it on September 23, 2008.

In December 2008, the YAI Board adopted a recommendation of its Executive Compensation Committee to amend the SERP to reduce Levy's annual benefit to $625,813. The amendment also reduced the SERP benefit due to Phil Levy and two other executives.

**D.     The Spousal Benefit and Levy's Marriage to Lynn**

The Original SERP entitled a surviving spouse to 100% of the participant's annuity for the spouse's lifetime. In 2007, YAI's Board amended the SERP to alter the spousal benefit. Under the 2007 amendment, if a participant remarried a younger spouse after September 27, 2007, the younger spouse's annuity "shall be adjusted to reflect a smaller annual payment which is actuarially equivalent to the normal payment" based on the age of the participant's older spouse. Dkt. No. 264-5 at 67. Before the reduction took effect, Levy divorced his first wife and married Lynn, who was seven years younger than Levy's first wife.

4

### E.    The Acknowledgement and Release

As Levy's retirement neared, YAI hired an independent actuary to calculate his SERP benefits. After the calculations were made, the board discovered that the cost of funding Levy's spousal benefit had increased dramatically as a result of his marriage to Lynn—by as much as $1.8 million. Members of the board believed that Levy had misled them about the increased cost associated with his marriage to Lynn, and Phil Levy began negotiating with his brother to reduce Lynn's survivor benefit. YAI decided to withhold payment of Levy's SERP benefits until he agreed to sign an Acknowledgement and Release ("A&R") that both reduced the surviving spousal benefit and ratified the parties' shared understanding of the calculation of Levy's SERP benefits.

Levy retired on June 30, 2009, and YAI withheld his SERP payments. On September 9, Eliot Green, YAI's recently appointed board chair, met with Levy to discuss the spousal benefit. Levy showed Green hundreds of pages of documents to walk through the history of his compensation package. Levy argued that the Board had repeatedly reviewed and repeatedly approved the SERP and that the Board had specifically reviewed and approved the surviving spousal benefit. Levy insisted that he had no reason to forego any amount of that benefit.

Green testified that after his conversation with Levy, he researched the history of Levy's compensation package. He met again with Levy and reported that he did not believe that the SERP or the surviving spousal benefit had been reviewed for reasonableness. Without such a review, he told Levy, the increase in the value of the spousal benefit left both YAI and Levy vulnerable to intermediate sanctions by the IRS.

Levy disagreed with Green's assessment and thought he was "irrational, crazy" and "denying reality" when he claimed that the SERP had never been reviewed for reasonableness.

Dkt. No. 471-1 at 7 (Levy Dep. at 437:20-438:112). Levy relied on opinions issued by YAI's

compensation consultants and lawyers establishing that the SERP was "grandfathered," immune

from intermediate sanctions, and presumptively reasonable. But Green insisted that Levy was

wrong.

According to Green's summary judgment submission, Phil Levy later talked Joel Levy

into foregoing half of the net present value of the spousal benefit. According to Green, Levy

opted to sign the A&R because of financial pressure. Without it, YAI would have continued to

withhold his retirement benefits. Green contends that he encouraged Levy to seek independent

legal counsel. Levy denies these facts.

For his part, Levy claims that it was the financial strain *and* his trust in Green's legal

advice that led him to accept the reduction in the spousal benefit. According to Levy, he trusted

Green after twenty-five years of their shared professional and personal relationship, and he

believed Green had given advice in Levy's best interest.

At a November 24, 2009 meeting of the YAI Executive Compensation Committee, Green

described his negotiations with Levy:

> Well, basically, I met with him about four times, and you know, he's
> a tough cookie. He tries to wear you down, and I'm used to that. I
> just happen to know the law a little bit better than Joel. One of the
> things that became apparent was that there was an intentional
> decision, correct decision, not to have a reasonableness opinion
> done with respect to . . . some aspects of the SERP[.] Because that
> is in fact how I got Joel to blink basically. . . . I basically said to him
> that I'm determined that you have . . . some vulnerability, given at
> least the cost attributable to the annuity that would fund the benefit
> to Judy.

Dkt. No. 471-26 at 4-5. Later during that meeting, Connors reported that the SERP would be

"rock solid" for the purposes of regulator reviews because the value of the annuity benefit had

been going down since the SERP was frozen at 2005 salary levels. In Connors's view, the benefit

to the plan participants had been negative since 2005. Dkt. No. 471-26 at 28-29. Phil told the committee that Levy had agreed to accept half the spousal survivor benefit once he "understood that there was a feeling that appearances of this were not good." Dkt. No. 471-26 at 35. The Board approved a draft of the final A&R reducing Levy's spousal survivor benefit.

Levy and Lynn signed the A&R in December 2009. By its terms, they agreed to the $625,813 annuity for Levy's lifetime and 72.84% of the surviving spousal benefit. The A&R purported to release YAI and its agents from liability relating to calculations under the Original SERP. Dkt. No. 467-15 at 3. It had no effect on YAI's obligation to buy a commercial annuity to fund Levy's benefits, and it specifically required YAI to pay Levy's SERP benefits. It recited that "the agreement by YAI to pay benefits in accordance with this Acknowledgement is good and valuable consideration" to Levy and Lynn "to support the foregoing agreement." *Id.* at 4. Green signed the A&R in his capacity as Chair of the Board and with the authority of the Board of Directors.

After Levy and Lynn signed the A&R, YAI made a back payment to cover past-due SERP benefits and continued paying Levy semi-monthly until July 15, 2011.

### F. The Medicaid Settlement

On May 28, 2009, YAI's former chief financial officer brought a *qui tam* action against YAI, Levy, and others, alleging that certain information reported in YAI's annual cost reports, a required annual government filing, was false. This lawsuit triggered a complaint-in-intervention from the Office of the United States Attorney for the Southern District of New York and the Office of the New York Attorney General.[1] In January 2011, the lawsuit was settled. YAI denied

---

[1] *United States of America, et al., ex rel. Richard Faden v. Young Adult Institute, Inc., d/b/a National Institute for People with Disabilities Network, et al.*, No. 09 Civ. 5003.

liability, but agreed to pay $18 million to state and federal governments and submitted to ongoing oversight by the New York State Office of the Medicaid Inspector General.

Following this settlement, officials from New York's Office for People with Developmental Disabilities ("OPWDD") expressed concern over YAI's ability to pay the settlement. OPWDD provides services to people with developmental disabilities directly or through private agencies like YAI. On March 25, 2011, OPWDD Deputy Commissioner Jim Moran requested a "comprehensive plan that details how YAI will be paying the Settlement Amount while maintaining fiscal stability and programmatic quality." Dkt. No. 485-1 at 1. YAI froze senior management's salaries, but Moran insisted on cuts to executive compensation. YAI told Moran that it had ended its contract with Levy and opted not to renew a contract with Phil Levy. In a July 27, 2011 letter, Moran asked YAI to detail the cost savings associated with ending the Levys' contracts.

### G.   The Controversy Over Levy's Compensation

On August 2, 2011, the New York Times ran a front-page article that examined Joel and Phil Levy's compensation packages in depth. The article was highly critical of YAI and detailed lavish fringe benefits including college tuition for the Levys' children. The first line of the article read: "Medicaid money created quite a nice life for the Levy brothers from Flatbush, Brooklyn."[2]

Two days later, OPWDD placed YAI on "Early Alert," a precursor to remedial action. The notice to YAI indicated that OPWDD's prior concern about YAI's fiscal viability coupled with the new revelations about its executive compensation practices had led to the decision.

---

[2] Russ Buettner, *Reaping Millions in Nonprofit Care for Disabled*, N.Y. TIMES (Aug. 2, 2011), http://www.nytimes.com/2011/08/02/nyregion/for-executives-at-group-homes-generous-pay-and-little-oversight.html.

In the wake of the scandal over their compensation, YAI stopped paying the Levys their SERP benefits. On August 9, 2011, Green met with other YAI Board members to discuss a strategy for ending their SERP obligations to the Levys. He and Board Trustee Jennifer Geiling had the following exchanged, which Green audiotaped:

> JENNIFER GEILING:  But my feeling is if the government could pass a clarification that government funds could not go into the SERP, the government could probably pass a clarification—
>
> ELIOT GREEN: That you're not paying that SERP out, right. Right. You're right. You connected the dots. And that's the position . . . we're saying . . .
>
> JENNIFER GEILING:  Government, find a way for us not to have to pay this.
>
> ELIOT GREEN: Right, right. I mean, because if government says, "Don't pay them" . . .
>
> JENNIFER GEILING: No shit? I know.
>
> ELIOT GREEN: . . . we're good.

Dkt. No. 498-10 at 8-9 (Tr. of Green recordings 185:13-186:1). That month, YAI hired the law firm Morgan Lewis & Bockius to provide advice regarding the enforceability of the SERP and the possibility that YAI could terminate it early. *See* Dkt. No. 484 at 51 (YAI's COF ¶ 168).

On August 25, 2011, Moran sent a letter describing OPWDD's "significant concerns" with YAI's financial viability and oversight. Dkt. No. 485-11 at 2. According to the letter, "the issues highlighted in the recent New York Times article" were "not limited to two individuals, Philip and Joel Levy, but to the entire Board of Trustees." *Id.* at 3-4. The letter demanded "a detailed report of both current and past executive compensation and fringe benefits," without specifically mentioning the SERP. *Id.* at 4. Green offered a detailed reply, setting forth numerous changes to the Board's structure and promising that "the Board is seeking a legal opinion on

YAI's options regarding the enforceability, potential termination and recoupment of compensation and benefits already paid or due to be paid to certain YAI executives." Dkt. No. 485-13 at 5.

In October 2011, YAI sent Moran an estimate of the SERP benefits payable to Levy and the other SERP participants and told Moran that the Levys' SERP payments were being frozen pending the report from Morgan Lewis. In November, YAI told Moran that Morgan Lewis had retained the consulting firm Mercer LLP to review the total cash compensation to the SERP participants. The goal of Mercer's review was to provide "a 'range' of reasonable compensation" that could offer "an objective, supportable basis for negotiating a settlement with the SERP beneficiaries." Dkt. No. 485-17 at 3. Green testified that Moran and OPWDD endorsed a strategy of settling with the SERP beneficiaries to preserve SERP funds for paying off the Medicaid Settlement. Moran wrote to Green to confirm "that no payments are being made to the Levy's [sic] from either the qualified plan or the SERP." Dkt. No. 485-21 at 2. He also asked Green "not to make any (further) payments to either Levy" until "a settlement agreement is reached." *Id.* Green viewed this instruction as a "mandate" to negotiate with the plan participants. Dkt. No. 487-4 at 13 (Green Dep. at 593:10-24).

### H.    The Mercer Opinion and the October 2012 SERP Amendment

In January 2012, Mercer issued draft opinions for each of the SERP participants. With respect to Levy's benefits, Mercer opined that his retirement benefits were excessive by at least $10.7 million. Given the benefits Levy had already received, Mercer recommended limiting any additional retirement benefits to $929,200. Mercer's report assumed that the Grandfather Rule did not apply to Levy's SERP benefits. This conclusion contradicted the previous reports and

opinions of YAI's attorneys, and YAI did not obtain a new legal opinion to support Mercer's view.

The other SERP participants agreed to settle with YAI for reduced SERP benefits. Levy, however, refused. According to Green's notes, he discussed Levy's recalcitrance in a June 2012 meeting with Moran. Green proposed an "[e]legant [s]olution" of amending the SERP to cap Levy's benefits at what Mercer had decided was reasonable and also approaching the IRS to seek intermediate sanctions if Levy threatened to sue. Dkt. No. 485-29 at 2. According to Green's call notes, Moran agreed, concluding: "Whatever the mechanism is to free up funds and pay off debt with Medicaid is key." *Id.* at 3.

YAI gave OPWDD a proposed schedule for paying off the Medicaid Settlement. The Board planned to amend the SERP, pay the participants who had settled their claim, set aside funds for settling with Levy (including litigation and transaction costs), and use the remainder of the SERP trust to pay off the Medicaid Settlement.

On October 19, 2012, the YAI Board purportedly amended the SERP to cap benefits at "no greater than the participant's maximum reasonable benefit as determined by Mercer LLC." Dkt. No. 264-5 at 89. The amendment also added a new Section 8.5 to the SERP, which read:

> 8.5 Reversion of Trust Assets at the Direction of New York State Office for People with Mental Disabilities. On or before October 31, 2012, the Administrator shall distribute all Trust assets to the Institute as required by the Institute's commitment to New York State Office for People with Mental Disabilities, except for that portion of the Trust necessary to satisfy a Plan participant's protected interest in the Plan as described in subsection (i) of Section 7.1 and to fund the related reasonable transaction expenses.

*Id.*

By the end of November 2012, YAI had paid off the Medicaid Settlement in full using the bulk of the SERP's funds, and OPWDD took the agency off of Early Alert.

11

Meanwhile, Levy refused to compromise his claims under the SERP and ultimately brought the instant suit. As leverage to force a settlement, YAI's counsel told the IRS that Levy was due an "excess benefit transaction" of "approximately $10,497,100 of excessive nonqualified deferred compensation." Dkt. No. 282 at 6 (R&R on Partial SJ Mot.). YAI continued to contact the IRS for over two years regarding this issue, and the IRS sent two letters disagreeing with YAI's analysis of the compensation package. YAI also filed a revised Form 990 for the fiscal year of 2011-2012, claiming that the value of Levy's SERP benefits exceeded reasonable compensation by more than $10 million. The Form 990 described Levy's present action as one to "compel YAI to pay the entire SERP amount, including that portion that exceeds reasonable compensation." *Id.* The IRS has never found Levy's retirement compensation to be unreasonable.

## II.    Procedural History

In their Third Amended Complaint, Levy and Lynn argued that YAI's refusal to pay his SERP benefits violated ERISA and that Green breached his fiduciary duty by inducing them to sign the A&R.

Active litigation ensued. In April 2015, the defendants sought to bifurcate the case by seeking a "ruling on the liability component of Plaintiffs' ERISA claims." Dkt. No. 223 at 1. The defendants asked the Court to consider a partial summary judgment motion "on a pure legal issue—whether YAI is prevented by New York law, federal law, and the organization's articles of incorporation and by-laws from paying excessive or unreasonable compensation to Plaintiffs." *Id.* at 2. The bifurcation was to decide issues of liability in order to facilitate settlement and streamline the trial. The Court agreed to bifurcation to decide issues of liability. *See* Dkt. No. 230 at 1.

In its motion for partial summary judgment, YAI argued that New York's Not-For-Profit Corporation Law and the Internal Revenue Code both prohibited YAI from paying its executives unreasonable or excessive compensation. It also argued that the Board had the authority to stop payment of excessive benefits to protect YAI's nonprofit status. YAI did not allege that the OPWDD had ordered it not to pay Levy's SERP benefits, and it did not argue that OPWDD's decision to place YAI on Early Alert status made payment of those benefits impossible.

Relying in part on YAI's failure to allege that an outside agency had instructed it to withhold Levy's SERP benefits, the Court denied the motion. The Report and Recommendation concluded: "Because Levy's compensation has never been adjudicated as unlawfully excessive, YAI's hindsight regret about the reasonableness of its compensation agreement does not justify reneging on its contract." Dkt. No. 282 at 1 (R&R). This Court overruled YAI's objections to the Report and Recommendation and adopted it in full.

The parties now cross-move for summary judgment.

## III.    Discussion

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., LP*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party "bears the initial responsibility" of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material, and only "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "Even where facts are disputed, in order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). To show that there is a disputed fact sufficient to deny summary judgment, the non-moving party must produce evidence and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). Rather, a party's response "must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (citation and internal quotation marks omitted).

Because "summary judgment is a drastic device that cuts off a party's right to present his case to a jury," the moving party "bears a heavy burden of demonstrating the absence of any

material issues of fact." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999)) (internal quotation marks and citations omitted).

### A.    YAI's Liability to Pay SERP Benefits

The plaintiffs move for summary judgment on the question whether YAI must pay *any* benefits under the SERP. The plaintiffs argue that the Court's partial summary judgment order was the final word on YAI's liability to pay. The only remaining question, in their view, is which version of the SERP controls.

YAI offers two arguments in opposition. First, it argues that the ruling on partial summary judgment was erroneous and asks the Court to reconsider it. Second, it argues for the first time that OPWDD, a state regulator, specifically instructed the agency not to pay Levy's retirement benefits. According to YAI, a genuine dispute of material fact exists over whether OPWDD's instructions made performance of the SERP contract impossible under federal common law.

### 1.    Standard of Review

Levy's SERP is a "top-hat" plan under ERISA, a pension plan "maintained by an employer for a select group of management or highly compensated employees." 29 C.F.R. § 2520.104-23(a)(1). The federal courts of appeals are divided as to the appropriate standard for reviewing a denial of benefits under a top-hat plan. *See Am. Int'l Grp., Inc. Amended & Restated Exec. Severance Plan v. Guterman*, 496 F. App'x. 149, 151 (2d Cir. 2012) (noting the circuit split but not taking a side). Some circuits conduct *de novo* review. *See, e.g.*, *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 443 (3d Cir. 2001). Others apply an arbitrary and capricious standard. *See, e.g.*, *Comrie v. IPSCO Inc.*, 636 F.3d 839, 842 (7th Cir. 2011). The Court need not decide which standard should apply because the SERP contains explicit provisions protecting vested benefits, thereby

limiting the administrator's discretion. Given these provisions, YAI's denial of benefits must withstand both standards of review.

### 2.      The Partial Summary Judgment Decision

In their motion for partial summary judgment, the defendants sought "a ruling on the liability component of the ERISA claims." Dkt. No. 223 at 1. Judge Netburn's Report and Recommendation concluded that "YAI's hindsight regret about the reasonableness of its compensation does not justify reneging on its contract." Dkt. No. 282 at 1. She rejected four specific arguments. First, she ruled that YAI had no defense under N-PCL § 720, which prohibits paying excessive compensation to non-profit executives, because it was preempted by ERISA and otherwise inapplicable. Second, YAI could not infer a defense from N-PCL § 515 because ERISA preempts state law and, in any event, § 720 provides an explicit right of action. Third, YAI could not raise the anti-inurement provision of IRC § 501(c)(3) as a defense. Fourth, absent an official finding that Levy's compensation violated the law, YAI cannot argue that New York's public policy excuses its default. In adopting the Report and Recommendation in full, the Court specifically found that a party to a contract could not "unilaterally and retroactively" determine that the contract was illegal. Dkt. No. 313 at 7.

The plaintiffs did not cross-move for summary judgment, and YAI argues that questions of fact remain regarding the reasonableness of Levy's SERP. But the Court already concluded that no factual dispute was material to the "legal question of whether the IRC, N-PCL, or the SERP authorizes YAI to withhold Levy's payments." *Id.* at 8. Accordingly, the Court concludes that state and federal law do not permit YAI to withhold Levy's SERP benefits simply because YAI and its agents have determined them to be excessive or unreasonable.

a.      Reconsideration

YAI urges the Court to reconsider its earlier ruling, but the Court declines to do so. According to YAI, the Court committed a clear legal error by overlooking a non-precedential summary order from the Court of Appeals for the Second Circuit. YAI's argument is misguided; the case it relies on does not contradict the Court's order.

In *Milnes v. Blue Cross & Blue Shield of Vt.*, a nonprofit hospital service company breached a contract to pay its executive a post-retirement incentive payment. BCBS argued that the contract was void for public policy because, after an investigation and an order to show cause, BCBS's state agency regulator had ruled in a consent order that Milnes's post-retirement benefits were excessive. The regulator did not consider the additional incentive payment, but the court concluded that it did not matter. The Second Circuit agreed that the payment was void under public policy, observing:

> Given the Commissioner's determination that Milnes's incentive compensation from 2001 to 2008 was based on a 'flawed' system that yielded excessive compensation under Vermont law governing nonprofit hospital service corporations, holding this contract for *additional* payments under that compensation scheme unenforceable will further the public policy goal of assuring reasonably priced healthcare.

*Milnes v. Blue Cross & Blue Shield of Vt.*, 566 F. App'x 18, 21 (2d Cir. 2014).

*Milnes* is fully consistent with the Court's partial summary judgment decision. In *Milnes*, a government regulator concluded in a consent order that the compensation scheme violated state law. Public policy therefore prohibited *any* additional payment, not merely payments that the regulator had explicitly prohibited. Here, YAI has presented no evidence that a regulator concluded that Levy's SERP benefit violated state and federal law. Instead, YAI offers only its own commissioned reasonableness report. But, as the Court has already concluded, the time for

YAI to make such a determination was *before* it agreed to Levy's compensation. Its own hindsight regret, even if bolstered by a commissioned compensation report, cannot void its contractual obligations. Otherwise, any jilted non-profit could get out of an employment agreement for the price of a compensation report, and uncertainty would reign.

> **b.    OPWDD's Decision**

For the first time, YAI asserts that OPWDD concluded that Levy's SERP benefits were excessive and argues that this conclusion offers a public policy defense. But YAI should have raised this argument in the partial summary judgment motion. That motion addressed "the legal question of whether YAI may withhold payment of plaintiffs' ERISA benefits on the ground that they are excessive or unreasonable under New York law, federal law or YAI's articles of incorporation and by-laws." Dkt. No. 230 at 1 (May 5, 2015 Order). That was YAI's opportunity to raise *every argument* justifying withholding payment under state or federal law. It failed to raise this one, and the argument was forfeited.

YAI counters that it could not have raised this argument in its partial summary judgment motion because the issue was unripe. But this protest is not convincing. To show that OPWDD prohibited the benefits at issue, YAI relies upon a series of 2011-2012 emails between OPWDD and YAI's own board members. These emails were unquestionably in YAI's possession at the time it moved for partial summary judgment. But even if further document discovery was required in order to develop the argument, it would not matter. After all, YAI requested permission to move for partial summary judgment. If YAI was not yet prepared to present its best case, it should have refrained from making an early motion.

In the alternative, if YAI had not forfeited this argument, it would fail on the merits. YAI has produced no evidence that OPWDD ever formally found that Levy's compensation violated

New York law. Although Green testified that OPWDD was "livid" about Levy's compensation, nothing in the record suggests that it found the payments to be unlawful. YAI cannot infer a public policy defense from the informal reaction of a state regulator.

### c.      Sanctions

The plaintiffs move for sanctions against YAI for asking the Court to reconsider its partial summary judgment decision without having a clear procedural vehicle to do so. The plaintiffs are mistaken. The plaintiffs' summary judgment motion put this question back into play, and it is within the Court's discretion to reconsider its interlocutory orders before entry of judgment. YAI's decision to relitigate this question may have been unwise—it has no strong grounds for arguing that the Court was wrong—but the plaintiffs have not established that YAI had *no basis* for requesting reconsideration or that the argument was made in bad faith. Accordingly, the Court declines to issue sanctions against YAI.

### 3.      YAI's Impossibility Defense

YAI argues that OPWDD's instructions offer an impossibility defense. According to YAI, questions of fact concerning OPWDD's enforcement activities prevent the Court from entering summary judgment on liability. YAI argues that if the factfinder concludes that OPWDD prevented YAI from paying Levy's SERP benefits, it should be excused as a matter of law from its default.

As a vested top-hat plan, the SERP is a unilateral contract governed by federal common law. The Second Circuit has assumed as much without explicitly holding this to be true. *See Gallione v. Flaherty*, 70 F.3d 724, 729 (2d Cir. 1995) ("[T]he premise of the exemption of top hat plans [from ERISA's vesting and funding requirements] *i.e.*, the executives' ability to negotiate for terms that will suffice to protect their interests, appears to imply that an executive

may negotiate contract rights that are enforceable."). Courts in this Circuit have followed suit, interpreting top-hat plans as unilateral contracts. *See, e.g.*, *Eastman Kodak Co. v. Bayer Corp.*, 369 F. Supp. 2d 473, 478 (S.D.N.Y. 2005); *Aramony v. United Way of Am.*, No. 96 Civ. 3962, 1998 WL 205331, at *10 (S.D.N.Y. Apr. 27, 1998); *Black v. Bresee's Oneonta Dep't Store, Inc. Sec. Plan*, 919 F. Supp. 597, 602 (N.D.N.Y. 1996). And other courts share this view. *See, e.g.*, *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281 (3d Cir. 1995); *Pratt v. Petroleum Prod. Mgmt Emp. Sav. Plan*, 920 F.2d 651, 661 (10th Cir. 1990).

Under basic principles of contract law, a party's performance can be excused when it "is made impracticable by having to comply with a domestic or foreign governmental regulation or order." Restatement (Second) of Contracts § 264. "The fact that it is still possible for a party to perform if" that party "is willing to break the law and risk the consequences does not bar" the party "from claiming discharge." Restatement (Second) of Contracts § 264, cmt. a.

But impossibility "will excuse a party's performance only if the fault of the party owing performance did not contribute" to the government action. *See Lowenschuss v. Kane*, 520 F.2d 255, 265 (2d Cir. 1975). "This fault standard has been taken to entail that parties who fail to challenge vigorously a governmental action, or who still have some chance of controlling its outcome, will be unable to cite the resulting order as grounds for a successful impossibility defense." *MG Ref. & Mktg., Inc. v. Knight Enter., Inc.*, 25 F. Supp. 2d 175, 188 (S.D.N.Y. 1998) (Sotomayor, J.). For example, courts have refused to recognize impossibility where "the judgment was entered upon defendant's consent." *General Aniline & Film Corp. v. Bayer Co.*, 305 N.Y. 479, 483 (1953); *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 842 (2d Cir. 1975) ("The party pleading impossibility as a defense must demonstrate that it took virtually every action within its powers to perform its duties under the contract."). Resolving whether the

20

party contributed to the government action "requires an examination into the conduct" of the party claiming the defense, and in "all but the clearest cases this will involve issues of fact" that must be resolved after trial. *Lowenschuss*, 520 F.2d at 265-66. But when the facts show that a party voluntarily consented to an order without putting up a challenge, the "defense should be dismissed as a matter of law." *MG Refining*, 25 F. Supp. 2d at 189.

YAI has not shown that there is a dispute of material fact as to its impossibility defense. Based on all the admissible evidence in the summary judgment record, YAI's defense would fail for three reasons. First, OPWDD never took any binding action that would prevent YAI from paying Levy's SERP benefit. Second, even if OPWDD's series of communications with YAI could be construed as a prohibition on paying Levy's SERP benefit, there can be no dispute that YAI contributed to the action. YAI *proposed* the "elegant solution"; OPWDD merely ratified it. Third, YAI has not shown that OPWDD issued any directive since 2012 that would prevent the agency from paying Levy's SERP benefit. YAI satisfied OPWDD's requirements for being released from Early Alert status when it paid the Medicaid Settlement. Now that YAI has paid the settlement, OPWDD's regulatory interference with its business is at an end. Nothing in the summary judgment record suggests that OPWDD would take any enforcement action in 2016 if YAI began paying Levy his contractually required benefits.

<strong>a. No Evidence Shows that OPWDD Determined that Levy's Compensation Was Unlawful</strong>

OPWDD's interest in YAI's business practices began after YAI agreed to the Medicaid Settlement. In March 2011, Moran wrote to demand a "comprehensive plan that details how YAI will be paying the Settlement Amount while maintaining fiscal stability and programmatic quality." Dkt. No. 485-1 at 1. After the New York Times investigated YAI's compensation practices, OPWDD also became concerned about executive compensation. The Early Alert letter

demanded a "detailed report of both current and past executive compensation and fringe benefits." Dkt. No. 485-11 at 4. But it did not mention the SERP at all, and no evidence in the record suggests that OPWDD was concerned primarily with Levy's retirement benefits. It was YAI that, by September 2011, was exploring legal avenues to cut off SERP payments.

In its motion, YAI claims that it was OPWDD, not YAI, that first raised the issue of Levy's SERP. But the admissible evidence does not support this view. Before October 2011, when YAI provided OPWDD with an estimate of SERP benefits payable to its executives, OPWDD had not specifically asked about the SERP. YAI told the agency that it would use the Mercer Report as a cudgel for settling outstanding SERP claims and redirect the savings to pay off the Medicaid Settlement. OPWDD ratified that plan and instructed YAI to withhold SERP payments to Levy until he settled his claims. But nowhere in the admissible summary judgment evidence is there a decree from the OPWDD that Levy's compensation violated state or federal law. Nor did OPWDD doubt that YAI was contractually obligated to pay Levy his benefits. In fact, Green's call notes indicate that, in September 2012, Moran fretted that Levy "could 'block' this strategy by going to court." Dkt. No. 485-29 at 2.

In support of its argument, YAI cites the district court opinion in *Milnes v. Blue Cross & Blue Shield of Vermont*, which talked about the doctrine of impossibility in detail. The district court there, as discussed above, concluded that after the hospital's regulator issued an order that *explicitly* found the plaintiff's pay to be *unlawful* under Vermont's nonprofit laws, it would be impossible to pay *any* additional compensation, including sums that the regulator had not specifically analyzed. In short, the court found impossibility only after the hospital showed that its regulator had concluded that any further payment "would violate the Vermont Statutes." No. 11 Civ. 00049, 2013 WL 1314520, at *7 (D. Vt. Mar. 28, 2013).

OPWDD made no such finding here. The record is devoid of any order or other official action from a state regulator finding Levy's SERP payments to be unlawful. Instead, YAI relies on a combination of informal negotiations with OPWDD and the Mercer Report to conclude that Levy's pay was unlawful. YAI's impossibility argument can thus be understood as another permutation of its public policy argument, and it fails for the same reasons.

### b.   YAI Made No Effort to Contest any Government Action

Even assuming that OPWDD's ratification of YAI's "elegant solution" amounted to a governmental decree to stop paying Levy's benefits, YAI cannot use the impossibility defense because YAI did not vigorously oppose the government's actions. To the contrary, the undisputed evidence shows that YAI vigorously supported government action. The record demonstrates that YAI concocted its "elegant solution" as a way of paying the Medicaid Settlement and simultaneously avoiding payment of Levy's contractual benefits. When OPWDD instructed YAI not to pay Levy until settlement of his remaining SERP benefits, the undisputed evidence shows that YAI did not protest. As early as September 2011, before OPWDD had any accurate assessment of the funds remaining in the SERP trust, Green and Geiling were scheming to find a way to get the government to order them not to pay Levy's retirement benefits.

*Milnes*, again, proves instructive. In that case, the hospital fought to prevent the regulator from upsetting its contract. The hospital "retained a law firm" and argued to its regulator that "its Board had reasonably relied on expert compensation consultants" in concluding that the plaintiff's "compensation was not excessive" and that it "could not recover any portion of his compensation under Vermont law." *Milnes*, 2013 WL 1314520 at *3. Only after putting up a fight—and losing—did the employer agree to the consent order that prohibited paying its executives.

YAI has not shown any evidence that it challenged OPWDD on the issue of Levy's

SERP compensation. In fact, the evidence shows the opposite: YAI's board sought out OPWDD

as a partner in its plan to undo its contract with Levy. Because YAI cannot point to any evidence

in the record to show that it challenged any instruction from OPWDD, its impossibility defense

is dismissed as a matter of law. *MG Refining*, 25 F. Supp. 2d at 189.

### c.     OPWDD Has Not Enjoined YAI from Paying Levy in 2016

Finally, even assuming that OPWDD's 2011-2012 conduct constituted government action

that made performance of the contract impossible (and further assuming that YAI did not waive

the defense), YAI has not presented any evidence that OPWDD issued an enforceable order that

would excuse its default.

The summary judgment evidence shows that OPWDD placed YAI on Early Alert in

August 2011 because of its concern that YAI would be unable to pay the Medicaid Settlement.

The evidence also shows that OPWDD took YAI *off* Early Alert in 2012, after YAI paid the

Medicaid Settlement in full. Nothing in OPWDD's notice releasing YAI from Early Alert

indicates that it was conditional. The notice did not mention Levy's SERP or prohibit payment of

his benefits. And YAI has not shown that OPWDD has been in further contact with YAI

concerning payment of Levy's SERP. The last documented communication about the SERP

comes from 2012, and YAI has not indicated that OPWDD has brought up Levy's retirement

benefits since that date. Indeed, despite the present lawsuit asserting Levy's right to payment

under the SERP, OPWDD has taken no action.

YAI argues that the course of negotiations between Green and Moran indicate that

OPWDD did not want Levy to receive SERP benefits. For example, in a January 2012 email,

Moran wrote: "[W]e would like you to agree not to make any (further) payments to either Levy

until such time a settlement agreement is reached." Dkt. No. 485-21 at 2. In November 2012, shortly before releasing YAI from Early Alert, Moran asked that YAI add language to a letter memorializing the payment of the Medicaid Settlement that was "more direct on expectations to limit payout to last beneficiary [i.e., Levy] and that the remaining balance of funds will be used for Agency Operations." Dkt. No. 485-33 at 2. To be sure, OPWDD supported YAI's strategy of reducing Levy's SERP benefits through either negotiation or unilateral amendment. But nowhere did Moran or any other regulator permanently prohibit YAI from paying Levy or conclude as a legal matter that voiding the SERP contract would be lawful. Indeed, OPWDD unconditionally released YAI from Early Alert, and prior informal negotiations with Moran have no independent legal force.

Finally, no evidence in the record suggests that OPWDD has threatened to revoke YAI's license if YAI were forced to pay Levy's contractually guaranteed SERP benefits. In the absence of an enforceable order or instruction, YAI cannot claim that paying benefits under the contract is impossible.

### B.    Payment Under the Original SERP

The plaintiffs move for summary judgment on the basis that the purported amendments to the SERP and the A&R are invalid under ERISA and unenforceable. YAI cross-moves for summary judgment, arguing that the plaintiffs are not entitled to benefits under the Original SERP, and, if they are entitled to benefits at all, they are entitled only to benefits as reduced by the SERP amendments and the A&R.

### 1.    Statute of Limitations

YAI argues that Levy is time-barred from challenging the cap on his SERP benefits because his cause of action accrued in March 2005, when the YAI Board clearly repudiated his

SERP benefits by adopting the recommendation of the Executive Compensation Committee. The plaintiffs argue that the 2005 Board resolution did not suffice to show the "clear intent" to amend Levy's SERP because the SERP was not actually amended until 2008. Accordingly, the plaintiffs argue, their cause of action accrued in 2008, and their 2013 complaint was timely.

ERISA does not impose a specific statute of limitations for actions under § 502(a)(1)(B), and courts apply New York's six-year statute of limitations to analogous contract actions. *Miles v. N.Y.S. Teamsters Conf. Pension and Ret. Fund*, 698 F.2d 593, 598 (2d Cir. 1983). An ERISA claim accrues "upon a clear repudiation" by a plan administrator "that is known, or should be known, to the plaintiff—regardless of whether the plaintiff formally applied for benefits." *Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 48 (2d Cir. 1999). The paradigmatic example of a "clear repudiation" is a denial of benefits. *See, e.g.*, *Costa v. Astoria Fed. Sav. & Loan Ass'n.*, 995 F. Supp. 2d 146, 152 (E.D.N.Y. 2014); *Yuhas v. Provident Life & Cas. Ins. Co.*, 162 F. Supp. 2d 227, 231-32 (S.D.N.Y. 2001). But courts have also found a clear repudiation where plan administrators spelled out certain amendments in a supplementary plan description. *See, e.g.*, *Hirt v. Equitable Ret. Plan for Emps., Managers & Agents*, 285 F. App'x 802, 804 (2d Cir. 2008); *Kunsman v. Conkright*, 977 F. Supp. 2d 250, 256-57 (W.D.N.Y. 2013); *Holland v. Becker*, No. 08 Civ. 6171L, 2013 WL 5786590, at *4 (W.D.N.Y. Oct. 28, 2013). Similarly, a letter from an ERISA plan administrator detailing a new schedule of benefits would suffice. *See Malerba v. N. Shore Long Island Jewish Health Sys.*, No. 10 Civ. 4715, 2013 WL 1828986, at *7 (E.D.N.Y. May 1, 2013). The touchstone is whether the "plan clearly and unequivocally repudiates the plaintiff's claim." *Carey*, 201 F.3d at 49-50.

YAI claims that the March 2005 Board Meeting was a clear and unequivocal repudiation of the Original SERP because the Executive Compensation Committee made a

"recommendation" to cap Levy's SERP at 89% of his total cash compensation, and the Board accepted "the Executive Compensation Committee Report and the approval and recommendations therein." Dkt. No. 461-15 at 4.

But the March 2005 Board Meeting was *not* a clear and unequivocal repudiation of Levy's rights under the original SERP for the simple fact that the Board did not amend the SERP at that time. The Board adopted the following resolution:

> After an hour discussion, with no further questions, the Executive Compensation Committee recommended to the Board the recommendations. A motion was made seconded and carried to accept the Executive Committee Report and the approval and recommendations therein.

Dkt. No. 461-15 at 4. The resolution evinces only the Board's resolve to amend the SERP. The Board took no action to actually amend the trust documents until 2008, and the plan administrator did not communicate any change in the trust to Levy. In 2008, YAI adopted the Amended SERP, which capped Levy's annual benefits at $625,813, effective July 1, 2008, and it was only then that the administrator clearly and unequivocally repudiated Levy's right to benefits under the Original SERP. *See* Dkt. No. 461-8 at 11 (2008 Amendment). "It would make no sense, and indeed do a remarkable disservice to the underlying purposes of ERISA and its disclosure requirements, to deem a notice claim to have accrued before a plaintiff knows or should have known that an amendment has the effect which triggers the notice requirement." *Romero v. Allstate Corp.*, 404 F.3d 212, 225 (3d Cir. 2005). It would make even less sense to deem a claim accrued before an amendment has even been made.

YAI argues that the 2005 board minutes constituted a unilateral amendment to the SERP because it met both necessary conditions required by the SERP for amendment. Section 7.2 of the SERP provides:

> Each amendment of the Trust shall be made by delivery to the Trustees of a copy of the duly authorized resolution of the Board or the Committee (or such other duly appointed committee of the Board), which sets forth such amendment. The certified copy of the resolution (with the consent of the Trustees endorsed thereon, if its rights, duties, or responsibilities are changed thereby) shall constitute the instrument of amendment.

Dkt. No. 461-7 at 22-23. YAI argues that all three trustees attended the March 2005 board meeting and received copies of the board resolution adopting the Executive Compensation Committee's SERP recommendations. According to YAI, this was sufficient under Section 7.2 to make an effective amendment, and where an ERISA plan "includes a procedure for amendment and this procedure is followed and recorded in the minutes of a Board meeting, the resulting amendments are effective, despite the absence of a written plan amendment." *Aramony v. United Way of Am.*, 28 F. Supp. 2d 147, 169 (S.D.N.Y. 1998), *rev'd in part*, 191 F.3d 140 (2d Cir. 1999).

The problem with YAI's analysis is that the amendment procedures require YAI to take specific steps before deeming an amendment adopted. ERISA "follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 85 (1995). Contrary to Section 7.2's specific direction, the March 2005 meeting minutes did not "set forth" any "amendment." The meeting minutes merely stated that "the twelve recommendations of the Executive Compensation Committee" were "approved and accepted." Dkt. No. 461-15 at 4. Standing alone, that statement amends nothing. Assuming that the Executive Compensation Committee's recommendations are included by reference, the relevant recommendation states, in its entirety:

> Retirement Plan annuity benefits to CEO and President/COO be
> equal to current dollar value of Salary+YAI Bonus, which presently
> represents an 89% replacement ratio of TCC for each executive.

Dkt. No. 461-15 at 14. This recommendation includes the substance of a *possible* amendment, but it does not "set forth" operative language that could amend the SERP.

Further, even assuming that the March 2005 board minutes set forth an amendment, YAI has not produced any evidence that it ever created a "certified copy" of the March 2005 resolution that was "endorsed" by the Trustees. Section 7.2 plainly requires such a document as "the instrument of amendment." Dkt. No. 461-7 at 23. In the absence of such a document, the SERP was not validly amended, and Levy's claim did not accrue.

YAI argues that Levy's claim accrued when he had actual knowledge of its intent to repudiate his SERP benefits following the March 2005 meeting. But even assuming that he did have such knowledge, it does not follow that his time to sue began on that date. A litigant should not be forced to sue when an adversary threatens an action but does not, in fact, take the action for some years. In this circumstance, the Board expressed its interest in amending Levy's SERP in 2005 but did not get around to doing anything about it until 2008. The law does not require claimants to guess when a claim accrues based on an adversary's own retrospective reconstruction of its dilatory and ambiguous conduct. Nor would it be fair to require a litigant to sue before an amendment has taken shape—even if he knows the amendment is in the works.

Because the Court concludes that the plaintiffs' action is not time-barred, it does not reach their argument for equitable tolling of the statute of limitations.

### 2.   Validity of the 2005 Amendment

For the reasons discussed above, YAI's purported 2005 SERP amendment was invalid because YAI did not follow the SERP's specific amendment procedures. *See Allen v. W. Point-*

*Pepperell, Inc.*, 908 F. Supp. 1209, 1222 (S.D.N.Y. 1995) ("Under ERISA, a change in the terms of a benefit plan is only valid if made in writing pursuant to the amendment procedure and by the amending authority set forth in the benefit plan.").

### 3.   Validity of the 2008 Amendment

In 2008, Levy signed the Employment Agreement, in which he agreed to amend the SERP to provide that his total annual benefit be capped at $625,813. After he signed the agreement, YAI amended the SERP to cap his benefits at that amount. Levy now argues that the 2008 Amendment was invalid because it deprived him of a vested right without following the amendment procedure specified in Section 7.2 of the SERP. YAI argues that Levy's Employment Agreement nullified the need to follow the SERP's amendment procedures because Levy explicitly agreed to the modification in the Employment Agreement. Levy counters that the Employment Agreement was not effective under ERISA to modify his SERP benefits because Fava had misled him to believe that his SERP had already been capped in 2005. He also argues that YAI failed to adhere to ERISA's notice requirements when it allegedly capped his SERP in 2005.

An individual "can waive his or her right to participate in a pension plan governed by ERISA," including by waiving specific benefits due under the plan, "only if his or her waiver is made knowingly and voluntarily." *Finz v. Schlesinger*, 957 F.2d 78, 82 (2d Cir. 1992) (internal quotation marks omitted). And "the language of an employment agreement is not legally sufficient to waive an employee's rights unless the waiver is clear and unambiguous." *Baraschi v. Silverwear, Inc.*, No. 01 Civ. 11263, 2002 WL 31867730, at *5 (S.D.N.Y. Dec. 23, 2002) (citing *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 231 (2d Cir. 1995)).

The Employment Agreement reads:

> the parties hereby agree that the SERP is hereby amended with respect to the Employee (and the Employer shall take any additional steps as necessary to effectuate the amendment of the SERP pursuant to this Agreement) to provide that the total annual benefit payable to the Employee under the terms of the SERP . . . shall be reduced to $625,813 (which is the amount accrued to the Employee prior to the reduction in the SERP formula agreed to by the Employee and Employer in 2005). Such reduction in the SERP formula shall be deemed to be incorporated into Section 10.2.1(b) of the SERP with respect to placing an overall limit on the product of 3% times the Employee's years of service with the Employer.

Dkt. No. 461-4 at 4. The waiver in this agreement is "clear and unambiguous." *Baraschi*, 2002 WL 31867730, at *5. The clause sets forth the specific benefit that Levy will be giving up—the three-percent-times-years-of-service benefit formula in Section 10.2.1(b)—and it states in plain terms what will take that benefit's place (an annual benefit of $625,813). The agreement also specifically recites that the SERP is "hereby amended" and that YAI is expressly authorized "to effectuate the amendment of the SERP," which it did.

Levy argues that he did not consent to the cap because he was misled regarding the effect of the 2005 purported amendment. According to Levy, Fava had led him to believe that the 2005 SERP amendment was a "*fait accompli*" and could not be challenged. *See* Dkt. No. 460-4 at 5-6. Levy further argues that YAI failed to provide him with the notice required by ERISA of his rights to challenge a change in benefits. According to Levy, the alleged misrepresentations and additional failure to notify made the waiver of his SERP rights involuntary, unknowing, and ultimately invalid under ERISA.

The Court pauses to observe that Levy has argued that the purported 2005 amendment was not a clear and unambiguous repudiation of his SERP benefit. To the contrary, he now argues that Fava told him that the 2005 *was* a clear and unambiguous rejection of his SERP benefit and, moreover, that Fava should be faulted for failing to advise Levy of his right to

challenge it. Levy cannot have it both ways. The Court has already determined that the 2005

amendment was *not* a clear and unambiguous rejection of the SERP benefit because it did not

amend the SERP. It follows that YAI had no obligation to inform Levy of his right to challenge

any reduction of his benefit for the simple reason that no reduction had yet been made.

Courts look to a non-exhaustive list of factors to determine whether a plaintiff waived

ERISA benefits knowingly and voluntarily:

> 1) the plaintiff's education and business experience, 2) the amount
> of time the plaintiff had possession of or access to the agreement
> before signing it, 3) the role of plaintiff in deciding the terms of the
> agreement, 4) the clarity of the agreement, 5) whether the plaintiff
> was represented by or consulted with an attorney, and 6) whether
> the consideration given in exchange for the waiver exceeds
> employee benefits to which the employee was already entitled by
> contract or law.

*Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1368 (2d Cir.

1991).

In some cases, an employer's deception will weigh against the *Laniok* factors. For

example, in *Krackow v. Dr. Jack Kern Profit Sharing Plan*, a case relied upon heavily by the

plaintiffs, a well-educated dentist negotiated a significant pay increase with the help of counsel.

The employment agreement was clear, the plaintiff had an active role in deciding its terms, and

he agreed to a lesser benefit than he was entitled to. The *Laniok* factors would seem to favor

enforcement of the waiver. But the court concluded that the waiver was unenforceable because

there was "no release or other document that makes specific reference to a claim being waived

for 1990-91." No. 00 Civ. 2550, 2002 WL 31409362, at *7 (E.D.N.Y. May 29, 2002). By

contrast, the plaintiff entered into a series of employment agreements for the period 1994-1996

"that specifically set forth" his "entitlement under the plan" and his "decision to waive those

benefits was unambiguously expressed." *Id.* Those agreements were enforceable.

32

*Finz v. Schlesinger*, 957 F.2d 78 (2d Cir. 1992), presented a similar scenario. The plaintiff, an attorney and former judge, sued his former employer over the denial of ERISA benefits. The parties ultimately settled, and the plaintiff relinquished his claim to certain benefits. He then argued that the waiver was not voluntary because his former employer had refused to provide him with documentation describing the terms of his ERISA plan. The court concluded that "there is no question that" the plaintiff "knew that he may have been covered under the plan when he relinquished his benefits." *Id.* at 83. The evidence showed that the plaintiff "testified that he left the firm as a result of a dispute over his pension benefits, suggesting that he never accepted the defendants' representations and in fact believed that he was covered by the plan." *Id.* In short, the plaintiff, "who at all times believed that defendants were misrepresenting his entitlement to benefits, should not be permitted to strike a better bargain at this late date by claiming that he signed the agreement in reliance on defendants' misrepresentations." *Id.*

*Krackow* and *Finz* control the outcome here. Unlike the first contract in *Krackow*, the Employment Agreement explicitly set forth the ERISA rights that Levy would be waiving. There can be no question that he was on notice that he may have had an ERISA benefit and that the waiver would relinquish it. And, like the plaintiff in *Finz*, Levy had no reason to rely on his adversary's legal assessment of his entitlement to benefits.

Levy argues that Fava's misrepresentations prevented him from knowing that he was giving up an ERISA benefit. According to Levy, Fava told him that there was nothing he could do in 2008 to undo the 2005 Amendment. But Fava's representation was not false—it was YAI's honestly held, though flawed, understanding of the legal effect of the 2005 board resolution. Fava's legal interpretation aside, the parties negotiated the Employment Agreement using the same set of operative facts, including the fact that YAI's board had approved a resolution to cap

Levy's SERP. Levy is a sophisticated businessman who negotiated his contract over a period of months with the help of counsel. He could and should have asked for an independent legal evaluation of the 2005 board resolution. Whether he did or not, he signed the Employment Agreement and explicitly waived his right to challenge the 2005 benefit calculation. Like the plaintiff in *Finz*, Levy relied on Fava's legal advice at his own peril. Nothing in the record suggests that he was bound by it.

Levy also argues that the 2008 Amendment to the SERP was not made according to the procedure required by Section 7.2 of SERP. But the procedural requirements of Section 7.2 were designed to protect Levy's interests. Having explicitly consented to the amendment, Levy cannot now complain that it was not properly made.

### 4.      Validity of the A&R

By signing the December 2009 A&R, Levy and Lynn purportedly agreed to release any claim to benefits under the Original SERP and to cap Lynn's survivor benefit. Levy seeks a ruling that the A&R is invalid because of lack of consideration and because YAI is in material breach of its provisions.

### a.      Lack of Consideration

According to the plaintiffs, the A&R was not supported by consideration because it obligated YAI only to pay benefits that it was already obligated to pay. YAI counters that the A&R compromised competing claims regarding Levy's benefits. The plaintiffs reply that YAI's argument relies on facts outside the four corners of the A&R, but, because the A&R is unambiguous with respect to consideration, the parol evidence rule prohibits consideration of those facts.

 In most cases, "the adequacy of consideration is not a proper subject for judicial scrutiny" because it is "enough that something of real value in the eye of the law was exchanged." *Apfel v. Prudential-Bache Secs. Inc.*, 81 N.Y.2d 470, 476 (1993) (internal quotation marks omitted). The performance of "a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration." Restatement (Second) of Contracts § 73. But a "waiver on the part of the promise of a legal right is sufficient consideration." *Jemzura v. Jemzura*, 36 N.Y. 2d 496, 504 (1975).

The A&R's clause regarding consideration comes at the end of an extraordinarily long sentence that reads, in full:

> Notwithstanding the preceding, it is specifically agreed and acknowledged by the Participant and the Spouse that the amount payable to Participant's surviving spouse if the Participant is married at the time of his death has been agreed to be reduced to a portion lower than the portion specified in the Supplemental Plan (from a 100% survivor benefit to a 72.84% survivor benefit) *based on a compromise reached by the parties* effective as of the date hereof, and the same shall control payments under the Supplemental Plan notwithstanding anything in the Supplemental Plan or the Employment Agreement to the contrary, *and that the agreement by YAI to pay benefits in accordance with this Acknowledgement is good and valuable consideration* to Executive and Spouse to support the foregoing agreements.

Dkt. No. 264-5 at 98 (emphasis added). The A&R specifically defines consideration as YAI's "agreement" to "pay benefits" in accordance with the "compromise reached by the parties." *Id.* A compromise of a legal dispute is sufficient consideration to support a contract. The face of the A&R establishes that it is supported by consideration—that the reduction in the spousal benefit was the result of a negotiated compromise.

The plaintiffs might argue that the contract was not based on *adequate* consideration because there was no bona fide compromise of rights. But in that case, it would be the plaintiffs,

not the defendants, who wish to evade the parol evidence rule. "Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013). The contract is not ambiguous because it plainly recites an adequate basis of consideration—"a compromise reached by the parties." Dkt. No. 264-5 at 98. But even assuming that the contract was ambiguous, weighing parol evidence is a mixed question of law and fact that cannot be decided on summary judgment. Thus, the Court denies the plaintiffs summary judgment on this question.

### b.   Material Breach

The plaintiffs argue that the A&R is not enforceable because YAI is in material breach of its terms. According to Levy, YAI's failure to pay benefits and its failure to purchase an annuity by June 30, 2010, voided the entire agreement. YAI argues that disputed questions of fact prevent the Court from deciding this issue on summary judgment.

A "party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain, or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). "There is no simple test for determining whether substantial performance has been rendered, and several factors must be considered, including the ration of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance." *Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y. 2d 88, 96 (1974). "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Merrill Lynch*, 500 F.3d at 186.

The Court declines to decide this question as a matter of law. The plaintiffs received SERP benefits under the A&R from July 1, 2009, until July 15, 2011, and the purchase of the annuity may not be necessary in light of the funds remaining in the SERP Trust. A trial will decide whether these breaches were substantial enough to warrant the plaintiffs' repudiation of the A&R.

### c.      Section 7.2

The plaintiffs also claim that YAI did not follow the procedures in Section 7.2 of the SERP when incorporating the terms of the A&R. But, to the extent that they explicitly agreed to the amendments and waived any right to challenge them, the plaintiffs have forfeited this argument.

### 5.      Validity of the October 2012 Amendment

The October 2012 amendment purported to limit Levy's SERP payments to the "maximum reasonable benefit as determined by Mercer LLC" and to authorize the trustee to distribute the trust's assets in accordance with "the Institute's commitment to New York State Office for People with Developmental Disabilities." Dkt. No. 264-5 at 89.

ERISA exempts top-hat plans from its vesting requirements, so courts look to "the customary principles of contract interpretation" to determine when a top-hat plan's benefits have vested. *Healy v. Rich Prods. Corp.*, 981 F.2d 68, 72 (2d Cir. 1992). In other words, a top-hat pension plan "is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years." *Kemmerer v. ICI Ams. Inc.*, 70 F.3d 281, 287 (3d Cir. 1995).

The parties do not dispute that Levy's plan became fully vested in 1989, after he reached nineteen years of service. The contract also plainly prohibits an amendment that reduces a

participant's vested benefit. The plain terms of the SERP therefore prohibit the October 2012 Amendment because it purported to reduce Levy's vested benefit payments.

### C.    Green's Motion for Summary Judgment

#### 1.    Statute of Limitations

Green argues that the plaintiffs' breach of fiduciary duty claims are barred by New York's three-year statute of limitations. The plaintiffs argue that their claims should be governed by the six-year statute of limitations applicable to breach of fiduciary duty claims. Alternatively, they argue that their claims are timely under the three-year statute of limitations because they accrued in 2011, when Green openly repudiated his alleged fiduciary relationship.

The plaintiffs' claims are barred by the statute of limitations because plaintiffs fail to demonstrate reasonable reliance on Green's alleged misrepresentations. The open repudiation doctrine does not apply because the plaintiffs do not seek equitable relief.

#### a.    Whether the Plaintiffs Pleaded a Fraud Claim

"New York law does not provide a single statute of limitations for breach of fiduciary duty claims." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009). Generally, a plaintiff seeking monetary relief must sue within three years after the claim accrues. N.Y. CPLR 214(4). But "where an allegation of fraud is essential to a breach of fiduciary claim, courts have applied a six-year statute of limitations under CPLR 213(8)." *IDT Corp.*, 12 N.Y.3d at 139. An allegation of fraud is essential when the breach of fiduciary duty claims "are based on allegations of actual fraud," *D. Penguin Bros. Ltd. v. Nat'l Black United Fund, Inc.*, 137 A.D.3d 460, 461 (1st Dep't 2016), and "when there would be no injury but for the fraud." *Paolucci v. Mauro*, 74 A.D.3d 1517, 1520 (3d Dep't 2010). In other words, when a breach of fiduciary duty

claim is inextricably bound to a fraud claim—that is, when it is a fraud claim by another name—the six-year statute of limitations applies.

To plead fraud, a plaintiff must allege "a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." *Kaufman v. Cohen*, 307 A.D.2d 113, 119 (1st Dep't 2003).

The plaintiffs allege that Green misled them by representing that Levy's SERP did not qualify for two safe harbors from the IRS's intermediate sanctions. Green allegedly told them that the SERP was not grandfathered and had not been reviewed for reasonableness. The plaintiffs have presented evidence that Green knew these representations were false: Connors told Green and the rest of the YAI Board that the SERP's protections against intermediate sanctions were "rock solid." But the plaintiffs have not presented evidence that they justifiably relied on Green's alleged misrepresentations.

"Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to find justifiable reliance." *Grumman Allied Indus. v. Rohr Indus., Inc.* 748 F.2d 729, 737 (2d Cir. 1984). Also, "a heightened degree of diligence is also required where circumstances were such that plaintiff had hints of falsity." *In re Eugenia VI Venture Holdings, Ltd. Litig.*, 649 F. Supp. 2d 105, 118 (S.D.N.Y. 2008). "The bulk of New York authority" follows "a two-tier standard in determining plaintiff's duty, according to whether misrepresentations relate to matters that are, or are not, peculiarly within the (defending) party's knowledge." *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980) (Friendly, J.), *abrogated on other grounds by Peltz v. SHB Commodities*, 115 F.3d 1082, 1090 (2d Cir. 1997).

When "misrepresentations have been held to concern matters that were not peculiarly within the defendant's knowledge, New York courts have often rejected plaintiff's claim of justifiable reliance[.]" *Id.*

The plaintiffs have not shown justifiable reliance. The summary judgment evidence demonstrates beyond genuine dispute that Levy was a "sophisticated businessman" who had "access to critical information" regarding his SERP and failed to take advantage of it. *Grumman*, 748 F.2d at 737. The history and legal status of Levy's SERP was not "peculiarly" within Green's knowledge; Levy had equal access to this information. *Mallis*, 615 F.2d at 80. In fact, Levy had "hints of falsity" that triggered "a heightened degree of diligence" that required him to dig deeper into Green's representations. *In re Eugenia VI Venture Holdings Ltd.*, 649 F. Supp. 2d at 118.

When Green and Levy first met to discuss the A&R, Levy spent hours walking Green through hundreds of documents to introduce him to the history of Levy's compensation. Later, after consulting with the YAI Board, Green told Levy that he had learned that the SERP was not immune to IRS intermediate sanctions. Levy testified that he thought Green was "totally wrong," "irrational, crazy," and "denying reality." Dkt. No. 471-1 at 7 (Levy Dep. at 437:20-438:112). This hint of falsity triggered Levy's sense of diligence, and he sought a second opinion from Connors. Connors would not talk to him, however, and the plaintiffs did not inquire further. But they should not have. Levy was a sophisticated businessman with a deep understanding of his own benefits package. Green was his counterparty, the chairman of a company that sought to reduce his benefit. Levy had no reason to rely on Green's apparently false representation.

Ordinarily, the question of reliance is "nettlesome because it is so fact-intensive." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997). But here the facts

lead inexorably to one conclusion: Levy should not have relied on Green's word because he had the means and motivation to check its validity. No reasonable jury could find that Levy justifiably relied on Green's alleged misrepresentations.

Because the plaintiffs cannot meet the elements of fraud as part of their breach of fiduciary duty claim against Green, a three-year statute of limitations applies to those claims.

### b.    Open Repudiation Doctrine

The plaintiffs argue in the alternative that their claims against Green are timely even under a three-year statute of limitations—on the theory that those claims were tolled until Green "openly repudiated" his fiduciary duty in August 2011. This argument fails. "[T]he requirement of a clear repudiation applies only to claims seeking an accounting or other equitable relief," not to claims for money damages like this one. *Kaszirer v. Kaszirer*, 286 A.D.2d 598, 599 (1st Dep't 2001); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*, No. 14 Civ. 10103, 2016 WL 1212573, at *5 (S.D.N.Y. Mar. 28, 2016); *Bd. of Trustees ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*, No. 11 Civ. 6345, 2012 WL 3930112, at *9 (S.D.N.Y. Sept. 10, 2012); *Cusimano v. Schnurr*, 137 A.D.3d 527, 530 (N.Y. App. Div. 1st Dep't 2016).  Because the plaintiffs' claims began to run in December 2009—when the plaintiffs executed the A&R—those claims are untimely.

### 2.    Release by the A&R

Even if the claims against Green were not time-barred, they must be dismissed because they were released by the A&R. Paradoxically, if the A&R is found to be invalid, and its release language a nullity, the claims must be dismissed because the plaintiffs suffered no harm from Green's alleged breaches of fiduciary duty.

41

**a.       Whether the Release Applies to Green**

A valid release "constitutes a complete bar to an action on a claim which is the subject of the release." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (internal quotation marks omitted). "Any words may be used, as long as they manifest the releasor's intent to discharge," and the parties' intent "will determine the scope of a release." *Bank of Am. Nat'l Trust & Sav. Assn. v. Gillaizeau*, 766 F.2d 709, 713 (2d Cir. 1985).

The A&R's release clause reads:

> The Participant and the Spouse hereby each individually, releases and discharges YAI, its predecessors, successors and all related entities, assigns, agents, directors, officers, representatives, and employees and one another ("Released Parties") from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses of any nature whatsoever under or relating to benefit calculations under the Supplemental Plan ("Released Claims") . . . .

Dkt. No. 467-15 at 3. In short, the plain terms of the clause release YAI's agents, directors, and officers, from any claim seeking SERP benefits in excess of the amount provided by the A&R.

On its face, the clause bars the plaintiffs' claims against Green. The claims are covered by the release because they seek benefits in excess of the amount provided by the A&R. The A&R covers Green because he was a director and officer of YAI when the contract was signed.

The plaintiffs argue that Green cannot enforce the contract because he is not a party to it. But a third-party beneficiary can enforce a contract when "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties." *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012) (internal quotation marks omitted). The A&R purports to release YAI's agents, officers, and

directors, all non-parties to the contract. To the extent that Green is a "Released Party," he therefore has standing to enforce the contract in order to give effect to the release clause.

The plaintiffs argue that Green is not a "Released Party" for the purposes of this lawsuit because he has been sued in his personal capacity, not his capacity as YAI's Board Chair. According to the plaintiffs, the Court's Order on the Motion to Dismiss made clear that ERISA preempted any claim against Green *qua* YAI officer, and the only claim that could survive was the claim against Green in his personal capacity as a fiduciary to the plaintiffs. The plaintiffs cite cases in which New York courts have refused to enforce release clauses that did not name the defendant specifically as a released party. *See, e.g.*, *Tonking v. Port Auth. of New York & New Jersey*, 3 N.Y.3d 486, 489-90 (2004); *Nazario v. 222 Broadway, LLC*, 135 A.D.2d 506, 510 (N.Y. App. 2d Dep't 1987). But these cases are inapposite. While the A&R did not mention Green by name, it did specifically release all "agents, directors, officers, representatives, and employees," including Green, the Board Chair. While ERISA law may draw distinctions according to whether a person is sued in his personal or official capacity, the A&R does not. The purpose of the A&R was broadly to release the plaintiffs' claims under former versions of the SERP, and the plaintiffs can identify no language in the contract that restricts the release's effectiveness based on an officer's capacity.

But even if the release applied to Green only in his official capacity, the plaintiffs have not shown that he was acting as anything other than YAI's Board Chair when he allegedly breached his fiduciary duty to them. That is, even assuming that the plaintiffs' allegations are true, the plaintiffs establish beyond dispute that Green was clearly acting on YAI's behalf by hoodwinking them into signing a contract that was in YAI's best interest, but not their own.

43

The plaintiffs argue that their claims against Green are not "Released Claims" because they do not challenge the calculation of benefits under Levy's SERP. But the clause releases claims "relating to benefit calculations." To prove damages for breach of fiduciary duty, the plaintiffs must show that they suffered some harm from relying on Green's advice. To do that, they must show that they lost money by signing the A&R because the A&R altered their benefit calculations. The plaintiffs' breach of fiduciary duty claims rely on an allegation that the A&R deprived them of benefits they were due. These are claims "relating to benefit calculations," and, thus, "Released Claims" under the A&R's release clause.

In sum, to the extent that the A&R's release clause is valid, it would bar the plaintiffs' claims against Green.

### b.      Whether the Release is Enforceable

Although Green would be covered by the A&R's release provision, the plaintiffs argue that a genuine dispute of material fact persists regarding whether the provision is enforceable. Even where "the language of a release is clear and unambiguous on its face, the court may still rescind that release where it finds . . . one party's unilateral mistake coupled with some fraud of the other party." *Allen*, 945 F.2d at 44 (alterations omitted). The plaintiffs allege that Green's fraud caused them to enter mistakenly into the A&R and to agree to its release provision. This argument fails for the reasons discussed above. The plaintiffs also argue that the A&R is unenforceable because of YAI's failure to pay benefits.

Green argues that this dispute of fact is beside the point because the case against him is paradoxical. If the A&R is found to be valid then the release language bars the claims. But if the A&R is found to be invalid, then the plaintiffs cannot show that they suffered any harm from

Green's alleged breach of fiduciary duty. Any alleged harm must be attributable to the A&R, and, if the A&R is unenforceable, they suffered no harm.

The Court agrees. The Court has ruled that if the A&R is enforceable then the claims against Green must be dismissed. But if the A&R is not enforceable, then the plaintiffs have not yet suffered harm from any alleged breach of Green's fiduciary duty. The plaintiffs seek a damages remedy, not an equitable remedy, but there is no loss yet to compensate.

The A&R purportedly harmed the plaintiffs in two ways: it reduced Levy's annuity to $625,813 and it reduced Lynn's survivor benefit. But the Court has found that Levy had *already* agreed to the annuity reduction in the 2008 Employment Agreement. So Levy cannot claim that the A&R harmed him at all. And Lynn has not suffered any economic loss because she has not received a reduced survivorship benefit—Levy still lives. If the Court rules that the A&R is unenforceable, it will be a nullity. YAI will be responsible for paying the plaintiffs their pre-A&R benefits, and the plaintiffs will have suffered no harm. There is therefore no need for a jury to determine whether Green breached any fiduciary duty.

### 3.    Breach of Fiduciary Duty

In any event, the claim that Green breached any fiduciary duty to Levy in the course of negotiations over the A&R fails as a matter of law. "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19 (2005) (internal quotation marks omitted). In order for such a relationship to arise, one person must repose such a high degree of trust and confidence in another that he confers "de facto control and dominance" in the purported fiduciary. *Doe v. Roman Catholic Diocese of Rochester*, 12 N.Y.3d 764, 765-66 (2009).  The evidence offered by the plaintiffs is insufficient

to support a finding that they conferred "de factor control and dominance" in Green. Even more fundamentally, "[w]hen parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (quoting *Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994); *Osan Ltd. v. Accenture LLP*, 454 F. Supp. 2d 46, 57 (E.D.N.Y. 2006). Here, as discussed above, it is beyond genuine dispute that Green was a counterparty in negotiations with Levy over the SERP. Green was YAI's Board Chair and represented YAI's interest in reducing Levy's compensation package. Levy—pointing generally to friendly conversations, *see* Dkt. No. 471-1 at 13-14 (Levy Dep. at 459:4-6, 460:3-464:22), and legal advice at an earlier time in a different context, *see* COF ¶ 119—fails to demonstrate the "extraordinary circumstances" required to overcome a presumption that Green did not owe him a fiduciary duty when negotiating as a counterparty to a contract. *See, e.g.*, *McKenzie v. Fishko*, No. 12 Civ. 7297, 2015 WL 685927, at *1 (S.D.N.Y. Feb. 13, 2015) (holding that "befriend[ing]" a counterparty "in order to gain [his] trust" does not establish a fiduciary relationship); *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 427 (S.D.N.Y. 1992) (finding that "trust and confidence" in the course of a fifty-year relationship did not constitute "extraordinary circumstances" sufficient to establish a fiduciary duty in the context of an arms-length transaction).

Therefore, Green is additionally entitled to summary judgment on the ground that no fiduciary duty could be found to exist as a matter of law.

### D.    Claims Against Israel Discount Bank

YAI argues that the plaintiffs' claims against Israel Discount Bank ("IDB") are moot because it is no longer the trustee of the SERP. The plaintiffs argue that they seek an accounting

for funds that they claim have gone missing from the SERP since this action was filed. They also contend that IDB is a necessary party to this action based on language in Section 9.2 of the SERP.

A claim is moot "only when it is impossible for the court to grant *any* effectual relief whatever to a prevailing party." *In re Kurtzman*, 194 F.3d 54, 58 (2d Cir. 1999) (internal quotation marks omitted). A court can grant relief only when a plaintiff has "suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id.* (internal quotation marks omitted).

The plaintiffs have no basis for demanding an accounting from the bank. Accounting is an equitable remedy that "consists of factfinding by a district court to determine the amount of money acquired through wrongdoing[.]" *S.E.C. v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006). The plaintiffs have not shown any evidence that IDB has committed wrongdoing. As the plaintiffs concede, IDB was bound to act only at the direction of the YAI Board. If IDB's actions harmed the plaintiffs, it was as a result of YAI's wrongdoing, not IDB's. The plaintiffs have not advanced any theory that any independent wrongdoing on the part of IDB (such as mishandling funds) has caused them injury.

The plaintiffs argue that IDB is a necessary party because the SERP's Section 9.2 says that the SERP's trustee is a necessary party in any action. But IDB is no longer the SERP trustee, Wells Fargo is. IDB no longer has control of the SERP trust and can take no action to impair the plaintiffs' rights or to make them whole.

Accordingly, the plaintiffs' claims against IDB are dismissed.

### E.      The Request for Interim Relief

The plaintiffs request an award of interim attorney's fees because of their success in defeating the motion for partial summary judgment.

ERISA § 502(g)(1) authorizes a court to award attorney's fees to a prevailing party in any action brought under ERISA § 502(a)(1)(B) or § 502(a)(3). ERISA's fee-shifting provision is discretionary, and fees can only be awarded "to a beneficiary who has obtained some degree of success on the merits." *Donachie v. Liberty Life Assurance Co. of Boston*, 745 F.3d 41, 46 (2d Cir. 2014) (internal quotation marks omitted). A court may also weigh the opposing party's bad faith, the opposing party's ability to pay, deterrence, the significance of the legal questions, and the relative merits of the parties' positions. *Id.* These are known as the *Chambless* factors. *See Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869 (2d Cir. 1987).

The Court concludes that the request for attorney's fees is premature. This case has not been fully litigated, and so the Court cannot fully apply the *Chambless* factors. The Court is mindful that this case has seen extraordinary delay, due in part to YAI's now plainly redundant motion for partial summary judgment. But trial is set for November 2016, and the parties will soon have a resolution to this case. The Court will reevaluate any motion for attorney's fees at that time.

The plaintiffs' request for payment of SERP benefits pending a final resolution of this case is also denied.

**IV.     Conclusion**

The plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part. YAI cannot avoid liability for defaulting on the payment of Levy's SERP benefits.

YAI's motion for summary judgment is GRANTED in part and DENIED in part. Levy agreed to the reduction of his SERP benefits in 2008, and the 2008 Amendment was valid. Disputed questions of fact remain regarding the effectiveness of the A&R.

Green's motion for summary judgment is GRANTED.

All claims against Elliot P. Green and Israel Discount Bank are hereby dismissed.

The plaintiffs' request for interim relief is DENIED.

The Clerk of Court is directed to terminate the motions docketed at Dkt. Nos. 403, 456, 464, and 468.


SO ORDERED.


Dated:  October 18, 2016
        New York, New York


_____
                J. PAUL OETKEN
             United States District Judge